**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 12-16-DLB-JGW**

**KEITH RUSSELL**                                                                **PLAINTIFF**

**VS.**                          **MEMORANDUM OPINION AND ORDER**

**CITI, CITIGROUP, INC., CITICORP CREDIT SERVICES, INC.,**
**AND DOES 1-10**                                                              **DEFENDANTS**

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## I.   INTRODUCTION

This is a proposed class action for breach of implied contract, unjust enrichment, and conversion.  Keith Russell alleges that his former employers, Citi, Citigroup, Inc.,[1] Citicorp Credit Services, Inc., and Does I-10, owe him unpaid wages and overtime because they forced him to work before and after his shift, and during rest and meal periods.  The Court has diversity jurisdiction over the instant action pursuant to 28 U.S.C. § 1332.  This matter is currently before the Court on Defendants' Motion to Compel Arbitration and to Dismiss the Complaint (Doc. # 52).  This motion is fully briefed and ripe for review.  (*See* Docs. # 53 & 54).  For the reasons set forth below, the Court will **deny** the motion**.**

## II.   FACTUAL BACKGROUND

According to the Complaint (Doc. # 1), Plaintiff Keith Russell worked at Defendants' call center in Florence, Kentucky as an hourly employee from August of 2004 to 2009.

---

[1] Defendants note that "[t]here is no corporate entity with the title 'Citi,' and 'Citigroup, Inc.' is not the employer of Plaintiff or the putative class members. That entity is Citicorp Credit Services, Inc. (USA)." (Doc. # 52 at 1, n. 1).

Plaintiff was paid according to the number of hours he was "logged in" to his phone system. To log in to this system, Plaintiff had to first log in to several computer programs, a task that required up to ten minutes per day. He then had to log out of these programs at the end of his shift, requiring another ten minutes. Plaintiff thus alleges that Defendants forced him to work "off-the-clock" for approximately twenty to twenty-five minutes per day.

Plaintiff further alleges that Defendants required him to work through rest and meal breaks. This was allegedly the result of Defendants' "reward structure" which "revolve[d] around non-stop phone time." (*Id.* at ¶ 25). Those employees who took too much time in between calls, even to use the restroom, were reprimanded or even terminated. According to Plaintiff, Defendants rigorously implemented this practice through its managers.

In 2004 and 2006, Plaintiff signed acknowledgments of Defendants' 2004 and 2006 Employee Handbooks, affirming that he had received and was obligated to read Defendants' 2004 and 2006 Arbitration Policies. (Doc. # 52-2, at ¶ 3). Neither party has included the 2004 or 2006 Arbitration Policies in the record. However, Plaintiff asserts, and Defendants concede, that the Policies did not prohibit Plaintiff from instituting or participating in class action litigation regarding employment-related claims. (Doc. # 53, at 2-3; Doc. # 54, at 11).

On January 12, 2012, Plaintiff initiated this class action with the filing of a Complaint alleging breach of implied contract (Counts 1 and 2), unjust enrichment (Count 3), conversion (Count 4), unfair wage and hour practices under Kentucky's Wage and Hour Act, K.R.S. § 337.385 (Count 5), and punitive damages (Count 6). By prior Order (Doc. # 45), entered on November 28, 2012, the Court granted Defendants' Motion to Dismiss Counts 1, 2, 4, and 6, leaving intact Counts 3 and 5.

2

In the instant motion (Docs. # 52), Defendants now inform the Court that on November 13, 2012, eleven months after filing this action, Plaintiff reapplied for employment at Defendants' Florence call center.  According to the Declaration of Shanti Rivers (Doc. # 52-2), Defendants' Employee Relations Manager, Plaintiff accepted an employment offer from Defendants on November 30, 2012.  (Doc. # 52-2, at ¶ 5).  On December 26, 2012, Plaintiff signed both Defendant's Arbitration Policy (Doc. # 52-7) and an acknowledgment of Defendants' 2013 Employee Handbook in which he affirmed that he had received and was obligated to read the Arbitration Policy (Doc. # 52-6).  (Doc. # 52-2, at ¶ 6).  He then began work on January 7, 2013.  (*Id.* at ¶ 5).

The Arbitration Policy specifically states:

> This Policy applies to both you and Citi, and makes arbitration the required and exclusive forum for the resolution of *all employment-related disputes . . . which* are based on legally protected rights . . . and *arise between you and Citi*, its predecessors, successors and assigns, its current and former parents, subsidiaries, and affiliates, and its and their current and former officers, directors, employees, and agents. . . . These disputes include, without limitation, claims, demands, or actions under . . . the Fair Labor Standards Act of 1938, . . . and any other federal, state, or local statute, regulation, or common-law doctrine regarding employment, . . . the terms and conditions of employment, . . . compensation, [or] breach of contract . . . .

(Doc. # 52-7, at 2) (emphasis added).

The Arbitration Policy further provides that for claims covered under the Policy, individual arbitration is the exclusive remedy:

> Claims covered under this Policy must be brought on an individual basis. Neither Citi nor any employee may submit a class, collective, or representative action for resolution under this Policy. To the maximum extent permitted by law, and except where expressly prohibited by law, arbitration on an individual basis pursuant to this Policy is the exclusive remedy for any employment-related claims which might otherwise be brought on a class, collective or representative action basis. Accordingly, you may not participate as a class or collective action representative or as a member of any class,

3

collective, or representative action, and will not be entitled to any recovery
from a class, collective or representative action in any forum.

(Id. at 3).

By signing his application for re-employment, Plaintiff acknowledged his
understanding that Defendants had "adopted an employment arbitration policy, described
in applicable employee handbooks and in the Principles of Employment, which requires me
to submit any and all disputes related to my employment or the termination of my
employment to binding arbitration . . . ."  (Doc. # 52-5, at 11).

By the instant motion, Defendants argue that by signing these documents, Plaintiff
agreed to submit the employment-related claims at issue in this action to binding arbitration.
Plaintiff disputes the notion that by accepting re-employment, he agreed to arbitrate these
claims.  The Court now turns to evaluate these competing arguments.

### III.   ANALYSIS

#### A.   Standard of Review

The Federal Arbitration Act provides that

A written provision in any . . . contract evidencing a transaction involving
[interstate] commerce to settle by arbitration a controversy thereafter arising
out of such contract or transaction . . . or an agreement in writing to submit
to arbitration an existing controversy arising out of such a contract,
transaction, or refusal, shall be valid, irrevocable, and enforceable, save
upon such grounds as exist at law or in equity for the revocation of any
contract.

9 U.S.C. § 2.  The FAA represents a "liberal policy favoring arbitration."  *AT&T Mobility LLC*
*v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (quotations omitted).  Congress enacted the
FAA in 1925 "in response to widespread judicial hostility to arbitration agreements."  *Id.*
The Act's purpose was to "place arbitration agreements on an equal footing with other

contracts." *Id.* The FAA thus requires federal courts to enforce arbitration agreements absent legal or equitable reasons to the contrary. *See* 9 U.S.C. §§ 3, 4.

In ruling upon a motion to compel arbitration under the FAA, the Sixth Circuit has instructed the district courts to answer four questions: (1) whether the parties entered into a valid agreement to arbitrate; (2) whether the dispute is within the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be non-arbitrable; and (4) if the court concludes that some, but not all claims are subject to arbitration, whether to stay the proceedings pending arbitration. *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). The Court need only address the second question here because it is dispositive of the instant motion. The Court therefore assumes without holding that the Arbitration Policy constitutes a valid agreement to arbitrate.

**B.      This action is not within the scope of the Arbitration Policy**

The question for the Court is whether the parties intended the Policy to apply retroactively to the claims asserted in this action. "When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally (though with a qualification [regarding the FAA]) should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Courts must therefore apply state-law contract principles to ascertain whether the parties intended to arbitrate a given matter. *Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527, 533 (E.D. Va. 1999). "[B]ecause the legal predicate of compulsory arbitration is contractual consent, courts can require arbitration only of those disputes which the parties have agreed to arbitrate." *Id.* (citing *Gateway Coal Co. v. United Mine Workers of America*, 414 U.S. 368, 374 (1974) (additional citation omitted)). As the Supreme Court has explained, "[n]o

5

obligation to arbitrate a labor dispute arises solely by operation of law. The law compels a party to submit his grievance to arbitration only if he has contracted to do so." *Gateway Coal*, 414 U.S. at 374.

Where there are doubts about the scope of the matters the parties have agreed to arbitrate, the FAA requires courts to apply a presumption of arbitrability. Section 3 of the FAA provides that –

> If any suit or proceeding be brought in any of the courts of the United States *upon any issue referable to arbitration* under an agreement in writing for such arbitration, the court in which such suit is pending, *upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement*, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added).  Thus, pursuant to the FAA, "[c]ourts are to examine the language of the contract in light of the strong federal policy in favor of arbitration [and] any ambiguities in the contract or doubts as to the parties' intentions should be resolved in favor of arbitration."  *Stout*, 228 F.3d at 714 (internal citation omitted).  This presumption should be indulged "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986).  With this framework in mind, the Court turns first to the proper application of state-law contract principles.[2]

It is well settled that the construction of a written contract is a matter of law to be decided by the court.  *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d 893,

---

[2]  The Court assumes that the Arbitration Policy at issue was executed in Kentucky, and thus applies Kentucky contract principles to determine whether the parties intended to arbitrate the claims at issue in this action.  These contract principles are relatively uniform across various states and thus, even if the Policy was not executed in Kentucky, the contract principles still apply.

895 (Ky. 1992) (citation omitted).  "The primary object in construing a contract . . . is to effectuate the intentions of the parties."  *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002).  The parties' intentions are to be discerned from the four corners of the contract.  *Id.*  In the absence of any ambiguities, the terms will be enforced as written.  *McMullin v. McMullin*, 338 S.W.3d 315, 320 (Ky. Ct. App. 2011) (citing *Whitlow v. Whitlow*, 267 S.W.2d 739, 740 (Ky.1954)).

"A contractual provision is ambiguous if the provision is susceptible to multiple or inconsistent interpretations."  *McMullin*, 338 S.W.3d at 320.  Contractual terms are assigned their ordinary meaning, *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 106 (Ky. 2003), and courts are "simply unwilling to torture words to import ambiguity into a contract where the ordinary meaning leaves no room for ambiguity."  *First Home, LLC v. Crown Communications, Inc.*, No. 2010–CA–001701–MR, 2012 WL 95560 at *5 (Ky. Ct. App. Mar. 15, 2012).

Here, the Policy's language states that it applies to –

*all employment-related disputes . . . which . . . arise between you and Citi*, its predecessors, successors and assigns, its current and former parents, subsidiaries, and affiliates, and its and their current and former officers, directors, employees, and agents.

(Doc. # 52-7, at 2) (emphasis added).  Defendants argues that the Policy applies retroactively to the claims asserted in this action.  The Court disagrees for several reasons, all of which were succinctly set forth by the United States District Court for the Eastern District of Virginia in *Hendrick*.  50 F. Supp. 2d at 535-36.

Hendrick was an electrician who was hired by Brown & Root, Inc. for four separate employment periods.  *Id.* at 529.  Each employment period was governed by a separate

contract.  *Id.*  Hendrick's third employment contract did not require arbitration of employment disputes.  *Id.*  Twenty-five days after his third employment period ended, Brown & Root adopted a "Dispute Resolution Program" ("DRP"), which required employees to arbitrate certain claims.  *Id.*  The DRP was included in Hendrick's fourth employment contract.  *Id.*  Following his fourth and final employment period, Hendrick filed a state court action against Brown & Root for the company's alleged unlawful use of his name and status as a licensed electrician during this third employment period.  *Id.* at 530.  Brown & Root removed to federal court and moved to compel arbitration of Hendrick's claims.  *Id.*

The DRP required employees to arbitrate

> *any legal or equitable claim, demand or controversy* in tort, in contract, under statute or alleging violation of any legal obligation between persons bound by this plan *which relates to, arises from, concerns or involves* in any way:
>
> (1) this Plan;
>
> (2) *the employment of any Employee*, including the terms, conditions or termination of such employment;
>
> (3) employee benefits or incidents of employment with the Company; or
>
> (4) *any other matter related to the relationship between the Employee and the Company* including by way of example and without limitation, allegations of: discrimination based on race, sex, religion, national origin or disability, sexual harassment, workers compensation, retaliation, defamation, infliction of emotional distress, or status, claim or membership with regard to any employment plan.

*Id.* at 529-30 (emphasis in original).  By signing his fourth employment contract, Hendrick agreed "that I will be bound by and accept as a condition of employment, the terms of the [DRP] . . . ."  *Id.* at 534.  Brown & Root argued that because the DRP was silent as to its

8

temporal applicability, and because the FAA contains a presumption of arbitrability, the DRP applied retroactively to Hendrick's claims. *Id.* at 534.

The court rejected Brown & Root's argument for four reasons. First, it held that the presumption in favor of arbitrability only applied where the parties' intent was in doubt. *Id.* at 535. It further held that the DRP contained no evidence that the parties had agreed to arbitrate pre-existing disputes. *Id.* Second, it noted that under Supreme Court precedent, the *absence* of language reflecting an intent to arbitrate does not equate to *doubt* about the scope of arbitrability. *Id.* The court reasoned that "[t]o convert that principle into a rule that an employer may insulate itself from pre-existing claims by failing to say so in explicit terms is a fundamental distortion of the principle." *Id.* Third, it found that neither the fourth employment contract, nor the DRP contained any ambiguity regarding its temporal applicability; rather, it found said language to be forward-looking. For instance, the contract employed the phrase "will be bound," and the DRP utilized the terms "relates to," "arises from," and "concerns or involves." The court recognized that each of those terms spoke in the present or future tense, particularly the term "arises from." *Id.*

Fourth, the court noted that, were it to say an employee waives his right to litigate his claims through silence in an employer-drafted contract, it would violate the long-standing rule that waiver only occurs when there is a "knowing and deliberate relinquishment of a known right." *Id.* at 535-36 (citation omitted). The court found no evidence that Hendrick had executed such a waiver. *Id.*

*Hendrick* bears close resemblance to this case. Both Hendrick and Plaintiff had a clear break between employment periods. In both instances, the contracts governing their later employment periods contained arbitration provisions forbidding litigation of

9

employment-related claims.   And, in both instances, the contracts governing their earlier employment periods lacked such a provision, and therefore permitted them to litigate employment-related claims.   Plaintiff, like Hendrick, thus permissibly filed suit under his prior contracts.   And, as in *Hendrick*, Plaintiff's Arbitration Policy contains no evidence that the parties intended to alter his 2004 and 2006 employment contracts so as to retroactively require arbitration of claims arising under those contracts.   The Sixth Circuit's decision in *Security Watch, Inc. v. Sentinel Systems, Inc.*, 176 F.3d 369 (6th Cir.1999) indicates that explicit language is required to achieve this result.

In *Security Watch*, the plaintiff sued the defendant over claims arising under a previous contract that permitted litigation.  *Id.* at 370.   The defendant argued that the new contract between the parties superceded the previous contract and required arbitration of the plaintiff's claims.  *Id.* at 372.   The Sixth Circuit rejected this argument in part because it held that "[h]ad the parties intended to apply the new [arbitration] processes to disputes arising under the previous contracts, we believe they would have done so explicitly."  *Id.* at 374.   So too here, the Court finds that if the parties had intended to apply the Arbitration Policy to this action, which arose under the 2004 and 2006 contracts, they would have included explicit language to that effect.   This finding is consistent with the principle that waiver of existing rights should be knowing and deliberate.  *Hendrick*, 50 F. Supp. 2d at 535-36 (citation omitted).

In addition, the Policy lacks any language referencing pre-existing claims or retroactive effect.   The absence of this language does not create doubt or ambiguity about what the parties agreed to arbitrate, as Defendants would have the Court believe.  *Id.* at 535.   Moreover, the Policy unambiguously references only prospective claims because it

includes the forward-looking term "*arise*"—not backward-looking terms such as "arose" or "have arisen."  The Court will not torture the term "arise" to find ambiguity about whether it encompasses pre-existing disputes.  *First Home,* 2012 WL 95560 at *5 (holding that courts are "simply unwilling to torture words to import ambiguity into a contract where the ordinary meaning leaves no room for ambiguity.").  Instead, the Court will assign that term its ordinary meaning.  *Frear*, 103 S.W.3d at 106.  To hold otherwise would be to require the Court to hold that a "dispute" may "arise" when it has already arisen.  The term "arise" is simply not susceptible to this interpretation.  *See McMullin*, 338 S.W.3d at 320 ("A contractual provision is ambiguous if the provision is susceptible to multiple or inconsistent interpretations.").  Since this action arose before Plaintiff signed the Arbitration Policy, the Court finds that it does not fall within the Policy.

Defendants point to other portions of the Policy which they say prohibit Plaintiff from participating in a class action, and which make arbitration the exclusive remedy for Plaintiff's claims.  Those portions, however, only apply to "claims covered under this Policy" (Doc. # 57-2, at 3):

> *Claims covered under this Policy* must be brought on an individual basis.  Neither Citi nor any employee may submit a class, collective, or representative action for resolution *under this Policy*. To the maximum extent permitted by law, and except where expressly prohibited by law, arbitration on an individual basis *pursuant to this Policy* is the exclusive remedy for any employment-related claims which might otherwise be brought on a class, collective or representative action basis. Accordingly, you may not participate as a class or collective action representative or as a member of any class, collective, or representative action, and will not be entitled to any recovery from a class, collective or representative action in any forum.

*Id.* (emphasis added).  Since the Court holds today that the "claims covered under this Policy" do not include the pre-existing claims asserted in this action, the entire paragraph

quoted above is inapplicable.

Defendants argue that where a broadly-worded arbitration provision is silent as to temporal applicability, courts have held that the provision applies retroactively. However, the case upon which Defendants primarily rely, *Watson Wyatt & Co. v. SBC Holdings, Inc.*, 513 F.3d 646, 648 (6th Cir. 2008), does not support the contention that silence equals retroactivity in all circumstances.

In *Watson Wyatt*, the Wyatt Company provided actuarial and consulting services to SBC Holdings from 1997 to 2002 without a formal contract. *Id.* In 2002, the parties signed a contract that included an arbitration provision agreeing to arbitrate "any dispute or claim arising from or in connection with this agreement or the services provided by Watson Wyatt." *Id.* In 2004, SBC Holdings learned that Wyatt had committed a data input error in 2001. Wyatt exchanged letters with SBC, suggesting that the parties arbitrate SBC's potential data input error claim. *Id.* When SBC would not agree to arbitrate the claim, Wyatt sued to compel arbitration. *Id.* The trial court denied his request to compel arbitration. *Id.* at 648-49.

However, the Sixth Circuit reversed on appeal. *Id.* at 649-652. The court found it critically important that the arbitration provision applied to claims arising from "the services provided by Watson Wyatt." *Id.* It interpreted this phrase as encompassing more than just claims arising out of the arbitration contract itself. *Id.* As a result, the court held that the "services provided by Watson Wyatt" were not limited by the "time frame of the agreement," and thus included the data entry error committed prior to execution of the arbitration contract. *Id.* at 650-651. The court thus gave retroactive effect to the arbitration provision because it referred to the parties' pre-existing business dealings.

12

*Watson Wyatt* is distinguishable primarily because the Arbitration Policy in this case does not refer to the parties' pre-existing employment relationship. It refers to "employment-related disputes . . . which . . . arise between" the parties. Therefore, there is no evidence that the parties intended to arbitrate disputes over employment matters pre-dating the Policy. *Watson Wyatt* is also distinguishable because the parties' pre-2002 relationship was not governed by contract, and thus the court did not have decide whether the 2002 contract altered any previous contract. Here, by contrast, the parties had two prior contracts that permitted Plaintiff to participate in class action litigation, and the Arbitration Policy is silent as to whether it alters these prior contracts.

*Watson Wyatt* is further distinguishable because, unlike this case, the dispute arose *after* the arbitration provision took effect. Specifically, the arbitration provision took effect in 2002, and the dispute did not arise until at least 2004, when the parties exchanged letters about SBC's potential data input error claim against Wyatt. *Watson Wyatt*, 513 F.3d at 648. Thus, the *Watson Wyatt* court had no occasion to address whether the arbitration provision applied to disputes which arose prior to arbitration provision's existence. Conversely, the instant dispute arose in 2012 when Plaintiff filed this action, eleven months before the Arbitration Policy took effect. The Court is therefore faced with an entirely different question than the *Watson Wyatt* court: whether the parties intended to arbitrate a pre-existing lawsuit.

Defendants argue that it makes no difference that this lawsuit was filed before the Arbitration Policy was instituted. They cite *Newhall v. Chase Home Finance*, No. 8:10-cv-2624, 2010 WL 8759340 (M.D. Fla. Dec. 22, 2010) as involving "nearly identical facts." (Doc. # 54, at 4). They are correct that *Newhall* involved a lawsuit filed before the

13

arbitration policy was effectuated.  But they fail to note the critical difference in the policy's language.  The policy in *Newhall* required the plaintiff to submit "all employment-related claims . . . *that I have* or in the future may have against [the defendant]."  *Id.* at * 1 (emphasis in original).  The Arbitration Policy at issue here, of course, includes no such reference to claims Plaintiff already had at the time the Policy took effect.  *Newhall* thus has no bearing on this case.

Defendants cite several more cases in a footnote for the proposition that "a broadly written arbitration provision, without temporal limitation, applies to claims arising before the agreement is executed."  (Doc. # 54, at 4 (citing Doc. # 52-1, at 11 n. 2)).  However, in most of those cases,[3] the claims arose *after* the arbitration agreement was executed.  *See Levin v. Alms and Associates, Inc.*, 634 F.3d 260, 261-62 (4th Cir. 2011); *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith*, 198 F.3d 88, 90-91 (2d Cir. 1999); *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 331 (10th Cir. 1993); *Kristian v. Comcast Corp.,* 446 F.3d 25, 30-31 (1st Cir. 2006).

*Kristian*, *Zink*, and *Belke* are further distinguishable because in those cases, the courts held that the arbitration policies referred to the parties' pre-existing business dealings.  For instance, in *Kristian*, the arbitration clause referred to "any claim or dispute related to or arising out of this agreement *or the services provided.*"  446 F.3d at 33 (emphasis in original).  The First Circuit held that "[r]ead most naturally, the phrase *'or the services provided'* covers claims or disputes that do not arise 'out of this agreement' and

---

[3] In another of Defendants' cited cases, *Belke v. Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d 1023 (11th Cir.1982), it is unclear whether the claim arose before or after the arbitration provision took effect.  Defendants' only other cited case, *Arrigo v. Blue Fish Commodities, Inc.*, 408 F. App'x 480, 481-82 (2d Cir. 2011), is inapplicable because the relevant passage concerning the arbitration provision in that case is merely *dicta*.

14

hence are not limited by the time frame of the agreements." *Id.*  The Eleventh Circuit seized on similar language in *Belke*, where the policy required arbitration of "any controversy between us arising out of your business."  693 F.2d at 1028.  The court held that "[a]n arbitration clause covering disputes arising out of the contract *or* business between the parties evinces a clear intent to cover more than just those matters set forth in the contract." *Id.* (emphasis in original).  The Tenth Circuit reached the same conclusion in *Zink* when asked to interpret a similarly-worded policy providing that "any controversy between [the parties] arising out of [plaintiff's] business or this agreement shall be submitted to arbitration."  13 F.3d at 331.  The court cited to *Belke* in holding that policy covered claims that pre-dated the policy.  *Id.*

Defendants also cite *Rand Bond of North America, Inc. v. Saul Stone & Co.*, 726 F. Supp. 684 (N.D. Ill. 1989) for the proposition that "when an agreement 'speaks in terms of relationship and not timing,' it should be interpreted to encompass prior claims."  (Doc. # 52-1, at 11).  In *Rand Bond*, the plaintiff attempted to sell silver futures through a broker ("C&S"), but the attempted sales were not executed, resulting in losses to the plaintiff.  726 F. Supp. at 685.  One week after these events, the parties executed an arbitration agreement which provided that "[a]ny controversy or claim arising out of or relating to your accounts shall be settled by arbitration." *Id.* at 687.  Sometime after the agreement took effect, the plaintiff sued for fraud, breach of contract, and other claims. *Id.* at 685.  The court held that the agreement encompassed the transactions even though they pre-dated the agreement. *Id.* at 687-88.  As the court explained

> [the] agreement extends to "[a]ny controversy or claim" stemming from [the plaintiff's] accounts in which [the defendant] has been the Futures Commission Merchant and C&S the Introducing Broker.  It speaks in terms

15

of relationships and not timing.

*Id.* at 688.  As with Defendants' other cited cases, however, *Rand Bond* is distinguishable. The lawsuit was instituted after the agreement took effect, the agreement included language that, at least in the court's view, referred to the parties prior dealings, and the parties did not have a prior contract governing their relationship.  None of these features are present in the case *sub judice*, as the Court has already detailed above.  *Rand Bond* is thus inapplicable.

Finally, Defendants insist that proper application of the FAA requires this Court to presume the arbitrability of this action.  They cite *Watson Wyatt*'s holding that under the FAA, "only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration will remove the dispute from consideration."  513 F.3d 646 at 650 (citing *AT&T Technologies*, 475 U.S. at 650) (internal quotation omitted).  But as explained above, courts may not use the FAA to presume arbitrability where there is no evidence that the parties intended to arbitrate a particular matter.  As explicated by the *Hendrick* court

> [the FAA's] presumption applies only to doubts respecting the scope of the agreement reached by the parties.  It does not apply in resolving doubts respecting whether the parties have reached an agreement respecting what they will arbitrate . . . .  A contrary view would permit employers to insert general arbitration provisions in standard form employment contracts and then rely on the presumption to carry their burden of proving that the parties agreed to arbitrate pre-existing disputes.

*Hendrick,* 50 F. Supp. at 533 (citation omitted).  Because there is no evidence that the parties intended to arbitrate the claims asserted in this action, the claims are not subject to arbitration.

16

## IV.   CONCLUSION

Accordingly, for the reasons stated herein,

   **IT IS ORDERED** that Defendants' Motion to Compel Arbitration and to Dismiss the

Complaint (Doc. # 52) is hereby **DENIED**.

This 10th day of July, 2013.



Signed By:
*David L. Bunning*
**United States District Judge**

G:\DATA\Opinions\Covington\2012\12-16 MOO denying motion to compel arbitration.wpd