UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 12-16-DLB-JGW

KEITH RUSSELL, on behalf of himself                                    PLAINTIFF
and all others similarly situated

vs.                          **MEMORANDUM OPINION AND ORDER**

CITIGROUP, INC. and CITICORP
CREDIT SERVICES, INC.                                                  DEFENDANTS

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Plaintiff Keith Russell, on behalf of himself and others similarly situated, seeks class certification of an unjust enrichment claim asserted against his former employers, Defendants Citigroup, Inc. and Citicorp Credit Services, Inc. (collectively, "Citi"). Specifically, Russell alleges that Citi unjustly enriched itself by instructing its phone representatives to perform certain work-related tasks before beginning (and after finishing) their paid shifts at the Louisville and Florence call centers. Citi insists that Russell's claim is not conducive to class treatment because it will involve many individualized factual inquiries. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## I.    Factual and Procedural Background

Citi is a global enterprise that furnishes a wide range of financial services and products to its customers. (Doc. # 92-5 at 12-14). It provides customer support for these services through call centers, which are staffed with phone representatives ready to respond to questions and concerns 24/7. (*Id.* at 3-4). At each call center, phone

1

representatives are assigned to one of several groups, which are dedicated to broad tasks such as customer service, collections or sales/credit. (*Id.* at 9). Within each group, there are approximately four to six job titles, used to differentiate amongst phone representatives based on earnings, experience and job description. (*Id.* at 7). Each group is also divided into teams that handle more specific duties. (*Id.* at 9). For example, phone representatives within the collections group may be classified as Collector I, Collector II or Collector III and assigned to an early delinquency team, a late stage team or a skip-tracing team. (*Id.* at 9-10).

These distinctions aside, all phone representatives are "non-exempt hourly" employees. (Docs. # 92-1 at 18; 91-11 at 7-9; 91-12 at 26). They are also "overtime eligible." (*Id.*). Accordingly, they earn an hourly wage for up to forty hours of work per week, and one and a half times their normal wage for each excess hour worked that week. (Docs. # 91-11 at 7; 91-12 at 46). Because their compensation is determined by the number of hours worked, these phone representatives must complete and submit detailed time sheets at the end of each week. (Doc. # 91-12 at 27-29).

In July 2007, Citi phased out its paper-based timekeeping procedures and introduced a new digitized system. (Docs. # 92-1 at 6; 91-17 at 15-16). Phone representatives in the customer service and credit/sales groups began using a program called ePay for time tracking. (Doc. # 91-6 at 6). The ePay program had two components–eWorkforce Management ("eWFM") and Call Management System ("CMS"). (*Id.*). While eWFM noted schedule exceptions, such as vacation time and sick leave, CMS tracked actual time worked by gathering data from each representative's phone. (*Id.*). Representatives clocked in at the beginning of their shifts by logging into their phones with

2

a unique code assigned to them.  (*Id.* at 7).  They used that same code to logout of their phones before taking breaks, to log in when they returned from breaks and to logout at the end of their shifts.  (*Id.*).  CMS then used the time stamps from the start of shift, start of lunch, end of lunch and end of shift to calculate the total time worked that day.  (*Id.*).

By contrast, phone representatives in the collections group used a computer application, known as the Time and Attendance Tracker ("TACT"), for timekeeping.  (Doc. # 91-9 at 3).  Once they started their computers, they had to log in to this application, which entered data every time a representative changed activities (i.e., beginning his or her shift, going on break or returning from training).  (Docs. # 91-9 at 5; 91-10 at 2).  In short, it tracked each collections representative's "productive time."  (*Id.*).

Both ePay and TACT operated in conjunction with an Internet-based system called the North American Time and Attendance ("NATA") program.  (Docs. # 91-12 at 15; 91-6 at 6; 91-17 at 16).  At the beginning of each week, NATA automatically generated time sheets for all non-exempt hourly employees.  (Doc. # 91-12 at 15).  The data collected by ePay and TACT was imported into NATA and used to update those time sheets at the end of the week. (Doc. # 91-12 at 2-5, 14 and 51).  Phone representatives could then access their time sheets through Citi's Employee Portal and make further adjustments if necessary.  (*Id.*). Once representatives reviewed their time sheets, their managers would approve them and submit them to the payroll department.  (*Id.* at 15).

3

According to Citi's Time Recording and Pay Practices,[1] phone representatives could not perform work-related activities outside of their scheduled hours.  (Doc. # 91-11 at 8). Work-related activities included:

- Logging on to, or off of, the phone and computer systems

- Performing regular work duties

- Reading bulletins, alerts or work e-mails

- Working on a Blackberry, working remotely or checking voicemail

- Completing time sheets

- Attending required business meetings or town halls

- Participating in required training sessions

- Clearing work area and shutting down phone and computer systems

(*Id.* at 9).  If a representative wished to perform work-related tasks during non-scheduled hours, he or she had to obtain manager approval first.  (*Id.* at 27).  However, even if a phone representative failed to do so, they would still be compensated for the time worked. (*Id.*).  They would simply be encouraged to seek manager approval in the future.  (*Id.*).

Although phone representatives were not supposed to log into their computers until the start of their scheduled shifts, they could not be ready to take calls without first starting their computers, opening applications and reading bulletins.  (Doc. # 91-19 at 29). According to Citi, phone representatives were given approximately ten minutes at the beginning of their scheduled shifts to become "call-ready."  (*Id.*).  However, managers

---

1) Russell suggests that Citi adopted these policies and procedures in 2009.  (Doc. # 91 at 17-19). However, many of them are included in the Time Recording and Pay Practices manual, copyrighted 2007, which suggests that Citi formulated them pre-*Osby*.  (Doc. # 91-11 at 3).

4

retained discretion to cancel this ten minute period, known as "closed-key" time, if there was a particularly high call volume one day.  (Doc. # 91-18 at 15).

A few months after Citi introduced its computerized timekeeping systems, Tolanda Osby, a phone representative based in Kansas City, Missouri, filed a collective action suit against Citi under the Fair Labor Standards Act ("FLSA").  (Doc. # 91-15 at 1).  Osby alleged that Citi prohibited its representatives from clocking in via phone or computer until the start of their shift, at which time they had to be ready to place or receive phone calls.  (*Id.* at 5).  The complaint does not indicate that representatives received any closed-key time.  Instead, it states that phone representatives had to perform work-related, preparatory tasks before starting their shift, contrary to Citi's above-described official policies.  (*Id.*).  Osby further alleged that Citi failed to compensate phone representatives for this pre-shift work.  (*Id.*).  The parties ultimately settled the case, and the court certified the case as a collective action under the FLSA "[s]olely for purposes of settlement."  (Doc. # 91-3).

In 2009, Citi responded to these allegations by implementing a Wage and Hour Remediation program.  (Doc. # 91-5).  As part of this program, Citi began phasing in the Collections Time Tracking System ("CTTS"), which tracked when a phone representative hit control/alt/delete on their computer keyboard and fed that time stamp into NATA.  (*Id.*; Doc. # 91-5). Citi maintains that it did not alter its position on the definition of work-related activities or the importance of recording all time worked.  (Docs. # 91-5 and 91-19 at 17).  It simply sought to re-train employees and managers in appropriate timekeeping practices and enhance the accuracy of the data collected.  (*Id.*).  Citi indicates that it had completed the remediation program and fully implemented CTTS by Spring 2010.  (*Id.*).

5

The instant civil action arises from allegations similar to those set forth in the *Osby* complaint. (Doc. # 1). Plaintiff Keith Russell worked as a customer service and credit/sales representative at Citi's call center in Florence, Kentucky from 2004 to 2009.[2] (*Id.*). He alleges that Citi unjustly enriched itself by requiring its phone representatives to clock in at the precise time that their scheduled shifts began, even though they had to perform several work-related tasks in order to become call-ready. (*Id.*). Similarly, he asserts that phone representatives had to clock out at the precise time that their scheduled shifts ended, and *then* perform additional work-related activities. (*Id.*). He claims that Citi calculated phone representatives' salaries based solely on the time sheets, thereby failing to compensate them for their "off-the-clock" work. (*Id.*). Russell states that this practice began in 2007, the year that Citi introduced its computerized timekeeping system, and continued until 2010, the year that Citi completed its Wage and Hour Remediation program. (*Id.*).

Although not mentioned in his complaint, Russell testified that he and his fellow phone representatives sometimes received closed-key time at the beginning of their shifts, he insists that it was not enough time to become call-ready and could adversely impact performance metrics. (*Id.*). He also claims that closed-key time was often cancelled by managers. (*Id.*). Thus, it did not save phone representatives from performing work-related activities off-the-clock. (*Id.*). Accordingly, Russell asks this Court to certify his unjust

_____

2) Although Citi officially terminated Russell's employment on July 31, 2009, he actually stopped working on July 22, 2008, when he went on short-term disability leave. (Doc. # 92-1 at 20-23; Doc. # 91-13). The record reflects that he did not perform any work for Citi between July 22, 2008 and July 31, 2009. (*Id.*). Citi re-hired Russell from January 2013 to March 2013, but his claims do not pertain to that period of employment. (Doc. # 92-1 at 37).

enrichment claim[3] as a class action.[4]  He suggests that the proposed class be defined as follows:

> All current and former telephone-dedicated phone representatives who worked as employees of Citi's Florence and/or Louisville, Kentucky call centers at any time between July 2007 and April 2010.

(*Id.*).

## II.   Analysis

### A.   Standard of Review

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

---

3) Russell also asserted claims for breach of implied contract regarding Citi's alleged failure to pay for work off-the-clock and provide rest breaks, conversion, unfair wage and hour practices and punitive damages.  (Doc. # 1).  The Court dismissed the first three claims.  (Doc. # 46).  Although the unfair wage and hour practices claim remains, Russell did not seek class certification of it.

4) Although Russell repeatedly refers to FLSA principles in his brief, he chose not to pursue this matter as a collective action under the FLSA.  The Court suspects that Russell did not do so because any such action would have been time-barred.  The FLSA provides that claims must be brought within two years after the cause of action accrued, with the caveat that claims for willful violations may be brought within three years after accrual.  *See* 29 U.S.C. § 255(a).  "A cause of action is deemed to accrue, as a general rule, at each regular payday immediately following the work period during which the services were rendered for which the wage or overtime compensation is claimed."  *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 187 (6th Cir. 2008).  Russell filed this action on January 12, 2012.  (Doc. # 1).  Thus, to avoid being time-barred, any non-willful claims must have accrued after January 12, 2010 and any willful claims must have accrued after January 12, 2009.  However, as the Court previously noted, Russell was on disability leave from July 22, 2008 until July 31, 2009, at which time Citi terminated his employment.  (Doc. # 92-1 at 20-22).  The record further indicates that he did not return to work at all during that time.  (*Id.*).  If Russell was not actually working for Citi during that time, then no claim could have accrued then.  Although Citi re-hired Russell from January 2013 to March 2013, any claims related to his second tenure would have accrued after this action was filed. (*Id.*).  At any rate, Russell indicated that he did not assert any claims related to his employment in 2013.  (*Id.* at 37).

  Because Russell is not suing under the FLSA, the Court must reject his repeated attempts to superimpose the FLSA's more relaxed standard onto its analysis regarding class certification of an unjust enrichment claim.  *See* 29 U.S.C. § 216(b) (stating that "[a]n action to recover the liability . . . may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and on behalf of himself or themselves and other employees similarly situated"); *see also* 7B Fed. Prac. & Proc. Civ. § 1807 (3d ed.) (explaining that most courts have ruled that "similarly situated" does not mean identical and that most courts have declined to apply Rule 23 certification requirements to collective actions).

7

--, 131 S. Ct. 2541, 2550 (2011) (*quoting Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  If the named parties meet the requirements of Federal Rule of Civil Procedure 23, they may "sue or be sued as representatives on behalf of all members" of a class.  *Id.* First, the parties seeking class certification must satisfy four prerequisites, often referred to as numerosity, commonality, typicality and adequacy of representation.  Fed. R. Civ. P. 23(a)(1)-(4); *Gen. Tele. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982) (explaining that these requirements "limit the class claims to those fairly encompassed by the named plaintiff's claims") (internal quotations omitted).  Second, they must meet "at least one of the three requirements listed in Rule 23(b)."  *Dukes*, 131 S. Ct. at 2549.

"Rule 23 does not set forth a mere pleading standard."  *Id.* at 2551.  Rather, the party seeking certification must "affirmatively demonstrate his compliance with the Rule." *Id.*  Certification is "proper only if 'the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  *Id.* (quoting *Falcon*, 457 U.S. at 161); *Comcast Corp. v. Behrend*; 133 S. Ct. 1426, 1432 (2013) (stating that these principles also apply to Rule 23(b)).  Such a "rigorous analysis" will often "entail some overlap with the merits of the plaintiff's underlying claim."  *Dukes*, 131 S. Ct. at 2551; *see also Falcon*, 457 U.S. at 160 ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.").

That being said, district courts must not "engage in free-ranging merits inquiries at the certification stage."  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013).  "Merits questions may be considered to the extent–but only to the extent–that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.*; *see also Messner v. Northshore Univ. HealthSys.*, 669 F.3d

802, 811 (7th Cir. 2012) (warning district courts not to "turn the class certification proceedings into a dress rehearsal for the trial on the merits").

### B.    *Rule 23(a) Prerequisites*

#### i.    **Numerosity**

First, the party seeking class certification must demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no strict numerical test for determining the impracticability of joinder." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Instead, courts must examine the specific facts of each case. *Gen. Tel. Co. v. E.E.O.C.*, 446 U.S. 318, 330 (1980) (explaining that the numerosity requirement "imposes no absolute limitations"). "When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by numbers alone." *In re Am. Med. Sys.*, 75 F.3d at 1079.

Citi's corporate representative, Raymond Bergman, testified that the Florence call center employed approximately 1,000 phone representatives at any given time between January 2007 and April 2010. (Doc. # 92-5 at 11). He also testified that the Louisville call center employed between 600 and 800 phone representatives at any given time in the proposed class period. (*Id.* at 5). Based on these numbers, Russell estimates that the proposed class includes 1,600 to 1,800 phone representatives. (Doc. # 91 at 20-21). Citi does not take issue with Russell's estimate, nor does it suggest that this figure is insufficient to satisfy the numerosity requirement. Having reviewed the record, the Court agrees that this is a reasonable estimate of the proposed class size and that joinder of all members would be impracticable. The Court therefore concludes that Russell has satisfied the numerosity prerequisite.

### ii.    Commonality

The party seeking class certification must also show that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  This language "is easy to misread, since '[a]ny competently crafted class complaint literally raises common questions.'" *Dukes*, 131 S. Ct. at 2550-51 (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131-32 (2009)).  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.* at 2551 (quoting *Falcon*, at 457 U.S. at 157).  "This does not mean merely that they have all suffered a violation of the same provision of law."  *Id.*  Rather, the class members' "claims must depend upon a common contention . . . that is capable of classwide resolution–which means that determination of truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  Stated another way:

> [w]hat matters to class certification . . . is not the raising of common 'questions'–even in droves–but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.* (quoting Nagareda, 84 N.Y.U. L. Rev. at 132).

Russell only seeks class certification for his unjust enrichment claim.  (Doc. # 91 at 8).  Under Kentucky law, "[t]he equitable doctrine of unjust enrichment is applicable as a basis for restitution to prevent one person from keeping money or benefits belonging to another."  *Rose v. Ackerson*, 374 S.W.3d 339, 343 (Ky. Ct. App. 2012) (internal quotations omitted).   Accordingly, a party must prove three elements to prevail on an unjust enrichment claim: (1) a benefit was conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit

10

without payment for its value.  *Jones v. Sparks*, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009).

When evaluating unjust enrichment claims, courts "must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist."  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256,1274 (11th Cir. 2009) (laying out the same three elements for an unjust enrichment claim).  "Due to the necessity of this inquiry into the individualized equities attendant to each class member, courts, including ours, have found unjust enrichment claims inappropriate for class action treatment."  *Id.* (reversing and remanding the district court's decision to certify a class for contract and unjust enrichment claims); *see also Grandalski v. Quest Diagnostics, Inc.*, 767 F.3d 175, 184 (3d Cir. 2014) (affirming the district court's decision to deny class certification on an unjust enrichment claim because "determining membership in the class would require individualized analyses into whether each putative class member was wrongfully harmed, such that the class could not be readily ascertained"); *Westways World Travel, Inc. v. AMR Corp.*, 265 F. App'x 472, 476 (9th Cir. 2008) (upholding the district court's decision to decertify a class because plaintiffs' RICO, contract and unjust enrichment claims would require individualized inquiries into defendants' contractual relationship with each class member).

Russell insists that he has satisfied the commonality prerequisite because he and the putative class members have all suffered the same injury.  Specifically, they endured "Citi's policy and practice of requiring phone representatives to perform uncompensated work."  (Doc. # 91 at 22).  He further posits that this common contention is susceptible to classwide proof because Citi imposed similar timekeeping practices, pay scales and remediation schemes on all phone representatives.  Thus, a determination that Citi had

such a policy and that it should have paid its phone representatives for pre- and post-shift work would resolve issues central to the validity of each putative class member's unjust enrichment claim.

As an initial matter, the Court doubts that this common contention is truly conducive to classwide proof. Russell's basic allegation depends upon an unofficial, unwritten policy of unknown origin. Although he alleges that this policy applied to all of the putative class members, it stands to reason that such a nebulous policy would be subject to varying levels of enforcement, depending upon the managers in charge of each group at each location. That being the case, Russell cannot prove that all putative class members were subject to the exact same policy in one stroke.

However, even if Russell could establish, on a classwide basis, that all of the Citi managers in Florence and Louisville implemented such a policy and that phone representatives should have been paid for certain pre- and post-shift tasks, the Court would still be left with many individualized inquiries inherent in a claim for unjust enrichment. The Court would likely have to look at the individual circumstances of each class member and determine whether he or she actually conferred a benefit on Citi, whether Citi appreciated that benefit and whether it would be inequitable to retain this benefit without payment for its value. The answers to these questions would likely vary, depending on what each class member did between turning on the computer and starting the shift, what he or she understood about Citi's official and unofficial timekeeping policies and whether his or her manager regularly used closed-key time. Under these circumstances, the Court simply cannot conclude that Russell has satisfied the commonality prerequisite.

### iii.   Typicality

The party seeking class certification must next demonstrate that his or her claims or defenses "are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3). Stated another way, the class members' claims must be "fairly encompassed by the named plaintiffs' claims." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851-52 (6th Cir. 2013) (internal quotations omitted).  This ensures that "the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members."  *Id.* at 853.

In practice, the concepts of typicality and commonality often overlap.  *See Dukes*, 131 S. Ct. at 2551, n. 5 (stating that both prerequisites "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence"). However, there is a distinction to be made between the two.  "'[T]raditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class.'"  *Vega*, 564 F.3d at 1275 (quoting *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001)).

As the Court previously observed, Russell's claim is based upon a nebulous unwritten policy, which was likely subject to erratic enforcement.  Therefore, it is unlikely that all managers at the Florence and Louisville call centers uniformly applied it to their groups.  Absent such uniformity, Russell cannot bring a claim that is typical of all class members.  The Court would not only have to consider how each manager instructed their

13

phone representatives to record time worked, it would also take into account each phone representative's subjective understanding of how he or she would be compensated.

However, even if the policy was uniformly applied, that alone does not make Russell's claim typical of the putative class. The Court would still have to determine whether the putative class members actually conferred a benefit on Citi, which it appreciated and inequitably retained without payment for value. One can imagine a host of circumstances in which some employees may have an unjust enrichment claim and others may not. Suppose that two customer service representatives started their computers fifteen minutes before the start of their shifts, but did not log in to ePay. One simply pushed the "Start" button, neglected his e-mail and went to the cafeteria to eat breakfast before the start of his scheduled shift. The other stayed at her station until the start of her shift, answering work-related e-mails and reading work-related bulletins. Although the policy applies with equal force to both, only one conferred a pre-shift benefit on Citi. Now suppose that the second employee edited her time sheet to account for those fifteen minutes. If she has received compensation for her pre-shift work, then Citi's retention of that benefit is no longer inequitable.

Russell's own testimony yields another good example. He testified that he sometimes received ten minutes of closed-key time at the start of his shift to review e-mails and bulletins. (Doc. # 91-18 at 15). Even when Russell did receive that time, he stated that it often was not long enough to start his slow-running computer and pull up the necessary applications. (*Id.* at 14). Thus, he often had to arrive at work early just to get

14

a head start on his closed-key time.[5]   (*Id.* at 23).   By contrast, several other phone representatives submitted affidavits, indicating that they regularly received ten or fifteen minutes of closed-key time and that the allotted time was more than sufficient to become call-ready.  (Doc. # 92-3).  If Russell performed work-related activities before closed-key time without compensation, while his co-workers with faster running computers did not, then he could have an unjust enrichment claim that is atypical of the class.  Because the individualized circumstances of each phone representative will delineate the equities in this case, the Court simply cannot conclude that Russell's claim is typical of the putative class.

### iv.   Adequacy of Representation

Finally, the party representative must show that he or she will "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4); *see In re Am. Med. Sys.*, 75 F.3d at 1083 (stating that this prerequisite "is essential to due process, because a final judgment in a class action is binding on all class members").  The Sixth Circuit has developed two criteria for determining adequacy of representation: "1) the representative must have common interests with unnamed members of the class; and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel."  *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976).  This inquiry also "tend[s] to merge" with the commonality and typicality factors, although the former "brings into play any concerns about the competency of class counsel and any conflicts of interest that may exist."  *In re Whirlpool*, 722 F.3d at 853.

---

5) Russell also testified that he sometimes had time to get a soda or chat with a neighbor while he was waiting for his computer system to boot up.  (Doc. # 91-18 at 24).

Russell claims that he is an adequate class representative because he has actively participated in this matter. He is also working with attorneys who are well-versed in class action litigation. Citi does not dispute either of these points. However, in light of the Court's prior analysis regarding commonality and typicality, it is not convinced that Russell has common interests with the unnamed members of the class. The Court does not mean to suggest that there are any obvious conflicts between Russell and the putative class members, nor does it question the qualifications of his legal team. But under the circumstances of this case, and given the equitable nature of the claim, the Court doubts that any phone representative would be able to fully and adequately represent the interests of the putative class. Accordingly, the Court concludes that the adequacy of representation requirement is not met.

Having found that the Rule 23(a) prerequisites are not satisfied, the Court could simply conclude that class certification is inappropriate and end its analysis here. Fed. R. Civ. P. 23(b) (stating that "[a] class action may be maintained if Rule 23(a) is satisfied *and if* one of three criteria are met") (emphasis added). However, out of an abundance of caution, the Court will proceed to consider the Rule 23(b) criteria.

### C.    Rule 23(b) Criteria

Rule 23(b) sets forth three circumstances in which class actions may be certified.[6]

---

6)  The first subsection "covers cases in which separate actions by or against individual class members would risk establishing 'incompatible standards of conduct for the party opposing the class,' or would 'as a practical matter be dispositive of the interests' of nonparty class members 'or substantially impair or impede their ability to protect their interests.'" *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997) (quoting Fed. R. Civ. P. 23(b)(1)(A) & (B)). The second authorizes class actions "for declaratory or injunctive relief where 'the party opposing the class has acted or refused to act on grounds generally applicable to the class.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(2)).

The third subsection, and the one that Russell seeks to utilize, is an "adventuresome innovation," which "added to the complex-litigation arsenal class actions for damages designed to secure judgments binding all class members save those who affirmatively elected to be excluded."  *Id.* (internal quotations omitted).  It is "[f]ramed for situations in which 'class-action treatment is not as clearly called for[,]'" but "'may nevertheless be convenient and desirable.'" *Id.* (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 697).

"To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions affecting only individual members'; and class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).  "In adding 'predominance' and 'superiority' to the qualification-for-certification list, the Advisory Committee sought to cover cases 'in which a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Id.* (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 697).

Courts should consider the following list of non-exhaustive factors in evaluating the predominance and superiority criteria:

> (A)    the class members' interests in individually controlling the prosecution of defense of separate actions;
>
> (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

### i.     Predominating Common Questions

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 133 S. Ct. at 1432 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997).  However, it "does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1196 (2013) (internal quotations omitted).

Because unjust enrichment claims often require numerous individualized inquiries, "common questions will rarely, if ever, predominate an unjust enrichment claim." *Vega*, 564 F.3d at 1274.       "Due to the central individualized issues . . . that preclude findings of commonality, typicality, or predominance, any trial of [such a] case would require the presentation of a substantial amount of evidence specific to each of an unknown number of class members." *Vega*, 564 F.3d at 1278.  "This reality poses serious challenges to the efficiency and manageability of a class action proceeding."  *Id.*

Russell contends that the common issue of "whether Citi failed to pay for logging-in to computers and booting up software programs [ ] predominates over any individual issues that may exist." (Doc. # 91 at 31).  As explained above, the Court doubts that Russell could answer this question for the entire class in one stroke.  However, even if he could provide a common answer, that answer would in turn generate numerous individualized inquiries relevant to an unjust enrichment claim.  For example, did each class member confer a benefit on Citi?  Did Citi appreciate that benefit?  And would it be inequitable, under the circumstances, for Citi to retain that benefit without payment for services?  Again, the

answers to these questions would likely vary, depending on what each class member did after turning on the computer, what he or she understood about Citi's official and unofficial timekeeping policies and whether his or her manager regularly used closed-key time.  Such fact-specific questions would quickly outnumber the common issue identified by Russell.  More importantly, these are the very questions that would address the equitable concerns at the very heart of Russell's unjust enrichment claim.  Under these circumstances, the Court simply does not see how Russell's common question could predominate.[7]

As for the factors identified in Rule 23(b)(3), both parties address only the likely difficulties in managing the case as a class action.  Consistent with their respective positions on the predominance issue, Russell argues that the case could certainly be managed as a class action, while Citi insists that it would be cumbersome and inefficient to do so.  Because individualized inquiries will likely abound in this case, and because Russell has not proposed any plan to feasibly address them, the Court finds that there will be considerable difficulties in managing this case as a class action.  It further concludes that Russell has failed to satisfy the predominance criteria.

---

7) Although not discussed in the commonality and typicality context, Russell states in his predominance analysis that he "can prove class-wide damages using the Windows log-in/log-out data that exists and extrapolating for any gaps or aberrations in the data."  (Doc. # 91 at 33).  He further contends that, "[a]t the very least, the time-stamped data provides proof of damages by statistical analysis, which is a common method of proving unpaid wages when the employer's records are deficient."  (*Id.*).  However, this assertion presupposes that every class member conferred a benefit on Citi from the second they started their computers until starting their shift; that none of the class members edited their time sheets to include this work; that none of the managers provided closed-key time; and that Citi knew of this benefit and inequitably retained it.  As Russell's own testimony reflects, this is simply not the case.  (Doc. # 91-18 at 24).  The varied circumstances of each phone representative will no doubt make it difficult, if not impossible, to prove damages on a classwide basis.

### ii.     Superiority of the Class Action

"Use of the class method is warranted . . . [when] class members are not likely to file individual actions."  *In re Whirlpool*, 722 F.3d at 861 (noting that this is often the case when "the cost of litigation would dwarf any potential recovery"); *see also Amchem Prods.*, 521 U.S. at 617 (observing that, in drafting Rule 23(b)(3), "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'").  This is often the case where the costs of litigation threaten to dwarf any potential recovery.  *Id.*

Russell insists that use of the class method is appropriate here because a phone representative's "individual recovery would pale compared to the time and expense of bringing and litigating an individual action." (Doc. # 91 at 35).  In support of this proposition, Russell points out that "expert data analysis comparing electronic time-stamp records . . . would cost more than [his] claim is worth, and is not a recoverable expense." (*Id.*).  Thus, he concludes that such claims are "negative value claims if pursued on an individual basis." (*Id.*).

The Court agrees with Russell's basic premise.  Because Citi allegedly failed to pay its phone representatives for minutes of pre- and post-shift work per day, the individual recovery likely would be small in comparison to the litigation costs and fees.  However, that fact is not enough to overcome the commonality, typicality, adequacy of representation and predominance defects discussed above.  Accordingly, the Court finds that Russell has failed to satisfy the Rule 23(b)(3) criteria, making class certification inappropriate in this matter.

## III.    Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** that Plaintiffs' Motion for Class Certification (Doc. # 91) be, and is,

hereby **DENIED**.

This 22nd day of December, 2015.



Signed By:
*David L. Bunning*
**United States District Judge**

G:\DATA\Opinions\Covington\2012\12-16 Russell MOO Denying Class Cert.wpd